JOURNAL ENTRY and OPINION
{¶ 1} On November 27, 2001, a jury found Peter Kenney guilty of aggravated murder and kidnapping. He appealed his convictions to our court, and, while that appeal was pending, he filed a motion for a new trial and a petition for postconviction relief. The trial court denied both and he appealed those judgments, in Appeal Nos. 81752 and 81879, respectively, which we consolidated for purposes of review and disposition.
 {¶ 2} In an opinion issued April 3, 2003, we affirmed Kenney's convictions, and, for the reasons given below, we now affirm the court's dismissal of his petition for postconviction relief, and furthermore dismiss his appeal from the court's denial of his motion for a new trial.
 {¶ 3} On this consolidated appeal, Kenney assigns the following errors for our review:
 {¶ 4} "I. The trial court erred in denying Mr. Kenney's petition for state postconviction relief without conducting an evidentiary hearing, because Mr. Kenney demonstrated substantive grounds for relief, i.e., that he was deprived of his state and federal constitutional rights to a fair trial and to the effective assistance of counsel, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article 1 of the Ohio Constitution. (Journal Entry, 9/20/02)"
 {¶ 5} "II. Peter Kenney was deprived of his right to a fair trial and due process of law, when the trial court refused to grant a continuance of the trial date requested by defense counsel to investigate exculpatory evidence that had not been disclosed by the State, in contravention of the Fifth and Fourteenth Amendments to the United States Constitution, and Section 16, Article 1 of the Ohio Constitution. (Journal Entry, 9/20/02; Tr. Pp. 12-13)"
 {¶ 6} "III. Peter Kenney was deprived of his right to a fair trial and due process of law based on the State's failure to provide timely disclosure of exculpatory evidence, in contravention of the Fifth andFourteenth Amendments to the United States Constitution, and Section 16, Article 1 of the Ohio Constitution. (Journal Entry, 9/20/02; Tr. 12-13)"
 {¶ 7} "IV. Mr. Kenney was deprived of his right to the effective assistance of trial counsel, in contravention of the Sixth andFourteenth Amendments to the United States Constitution, and Section 10, Article 1
of the Ohio Constitution. (Journal Entry, 9/20/02)"
 {¶ 8} "V. The trial court erred when it denied Mr. Kenney's Motion for New Trial and deprived Mr. Kenney of his right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article 1 of the Ohio Constitution. (Journal Entry, 8/16/02)"
 {¶ 9} In State v. Kenney, Cuyahoga App. No. 80653, 2003-Ohio-1501, we summarized the facts of this case as follows:
 {¶ 10} "The facts leading to this appeal arise from the execution-style killing of 17-year-old Terrence Robinson on April 17, 2001. Just before dawn on the 17th, police responded to a call about `gunshots in the area and a male down in the backyard' at 3370 W. 95th Street, Cleveland, Ohio. Tr. 238.
 {¶ 11} "At trial, police officer Gary Helshel testified he was one of the first officers to arrive at the scene. Officer Helshel entered the backyard at 3370 W. 95th and discovered Robinson's partially nude and lifeless body face down. Tr. 239-240. Detective Michael O'Malley described how Robinson was found clad in his underwear with other pieces of clothing strewn near his body. Tr. 239-240, 614-616.
 {¶ 12} "An autopsy revealed that Robinson had been shot seven times in different parts of his body. One close-range gunshot wound was found in the top of his head. The coroner testified that of the seven gunshot wounds the one in the top of Robinson's skull was fatal. Tr. 293, 296, 340. The coroner estimated that when that shot was fired, the gun was probably about 12 inches away from Robinson's head. Tr. 305. The head wound was the last of the seven gunshot wounds Robinson endured. Before that shot, Robinson was still alive but had been immobilized by the six other bullets, several of them fired into his lower extremities. Tr. 255-256, 273, 380.
 {¶ 13} "Robinson was killed in the backyard of the house where Renee McBride lives. She told the jury that Robinson sometimes stayed at her house and that, as of the 17th, he had been living there for about a month. On the morning of the shooting, McBride testified she heard two gunshots, heard Robinson crying for help, and then heard four more shots. Tr. 255-256.
 {¶ 14} "Timmon Black, visiting at his girlfriend's house on W. 95th on the 17th, testified that he awoke when he heard gunshots around 4:00 a.m. Black described what he saw when he looked out the window towards McBride's backyard: `I saw two guys standing off to the side and then I saw the guy laying on the ground * * * and then a guy just popped out of nowhere like a ghost, came from around the other two guys * * * and shot him and they ran off.' Tr. 380-381. Black stated the man who came out of nowhere was `about a foot' away from Robinson when he fired the gun. Tr. 384. Even though there was very little illumination, Black was able to identify the shooter as a white male because `as he jumped up to go away * * * the hood come back * * * you could see that white face in the dark.' Tr. 383-386. Lynette Schirger, who lives on W. 97th, testified that defendant was known in the neighborhood as `Shorty.' Schirger told the jury that when she awoke on the 17th between 10:00 a.m. to 11:00 a.m., Shorty, her friend, was visiting her live-in boyfriend, Daniel Fox. According to Schirger, Fox and some friends, including defendant, had gone out the night before the shooting to get high. Tr. 410-412. When she spoke with defendant the next morning, Schirger stated that he was still `high.' Tr. 416. Schirger described her conversation with defendant that morning:
"* * *
 {¶ 15} `Q: Did Shorty say anything to you?
 {¶ 16} `A: He was all hyped up and he started talking about how he murdered the black boy.
 {¶ 17} `Q: Did he use the term black boy?
 {¶ 18} `A: No.
 {¶ 19} `Q: What term?
 {¶ 20} `A: He used the term nigger.
 {¶ 21} `Q: What exactly did Shorty say to you?
 {¶ 22} `A: That he murdered the nigger and that's what he deserved.
 {¶ 23} `* * *.
 {¶ 24} `Q: Did he use a name * * * did he say a name of the person he shot?
 {¶ 25} `A: Yeah. I specifically asked who and he said Terrence.
 {¶ 26} `* * *
 {¶ 27} `Q: What else does he say? Does he say where he did this?
 {¶ 28} `A: He didn't specifically say which backyard, he just said it was in a backyard.
 {¶ 29} `Q: What else did Shorty say other than it was in a backyard?
 {¶ 30} `A: That the kid was face down in a mud hole and that he was stripped down to his boxers.' Tr. 417-420.
 {¶ 31} "Bothered by defendant's statements, Schirger asked him to leave. Defendant remarked, `If you don't believe me watch the news.' Tr. 420. When Schirger watched the news, she did, in fact, see footage on Robinson's murder. Later, Schirger met with police and from a police photo array identified the defendant's photograph as that of Shorty. Tr. 423-424.
 {¶ 32} "Schirger's boyfriend, Daniel Fox, was called as a court witness. According to him, defendant had arrived at the house in the early morning hours of the 17th. Two weeks after Robinson's murder, Fox gave a written statement to police in which he said he had gotten high with defendant the night before Robinson's murder. When defendant left that night he was so high he "could barely walk." Fox went to bed and was asleep when defendant arrived at the house around 3:00 a.m. Fox opened the door and saw defendant hand a gun to another person who was also standing outside with him. After entering the house, defendant admitted to Fox he had killed Robinson. During examination by the state, however, Fox claimed police had threatened to charge him with Robinson's murder if he did not make the statement incriminating defendant.
 {¶ 33} "Bonnie Cozart also lived in the W. 95th neighborhood and knew defendant. Two days after Robinson's shooting, Cozart spoke with defendant and recalled that conversation to the jury:
 {¶ 34} `Q: Now, tell the jury, ma'am, what did he tell you that day, two days after this murder, what did he tell you?
 {¶ 35} `A: Okay. I stopped because I said hey what's up, Shorty. He said not much. Did you hear about what happened the other night? I said what? The kid that got shot. He said yeah. He said, we shot him. I said why did you do something like that? The kid pissed us off, so we shot him.' Tr. 477-478.
 {¶ 36} "Cozart stated that, after this conversation, she did not see defendant around the neighborhood at all.
 {¶ 37} "Police eventually learned that, on the same day as Robinson's murder, defendant had asked a friend to take care of his dog. Defendant's whereabouts remained unknown until on or about May 5, 2001, when he indicated a desire to surrender to police."[1]
 {¶ 38} The grand jury indicted Kenney of four counts: aggravated murder with prior calculation and design, aggravated murder, aggravated robbery, and kidnapping.
 {¶ 39} Following trial, the jury found him guilty of aggravated murder, with an accompanying firearm specification, and kidnaping, also with an accompanying firearm specification; it acquitted him of the remaining counts.
 {¶ 40} Kenney appealed his convictions. During the pendency of that appeal, Kenney filed a "Motion for Leave to File Motion for New Trial Instanter" and a motion for a new trial, and also a petition for postconviction relief. On August 16, 2002, the court denied his motion for a new trial; on September 20, 2002, it journalized its findings of fact and conclusions of law, dismissing his petition for postconviction relief without conducting a hearing. Kenney appealed from both judgments, which we consolidated for review.
 I. Civil Appeal {¶ 41} Kenney's first, second, third, and fourth assigned errors relate to his petition for postconviction relief, and we address them jointly.
 {¶ 42} R.C. 2953.21 et seq provides a statutory mechanism for a criminal defendant to petition the court for an evidentiary hearing and request relief on the basis that his or her conviction is void or voidable on state or federal constitutional grounds. See R.C.2953.21(A)(1).
 {¶ 43} We first determine whether Kenney's claims for postconviction relief are procedurally barred.
 {¶ 44} "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at trial, which resulted in that judgment of conviction, or on an appeal from that judgment."[2]
Pursuant to res judicata, a defendant cannot raise an issue in a petition for postconviction relief if he or she could have raised the issue on a direct appeal[3]; a petition for postconviction relief is not the proper vehicle to raise issues that were or could have been determined on a direct appeal.[4]
 {¶ 45} We recognize the courts have allowed an exception to res judicata when a petitioner presents new, competent, relevant and material evidence dehors the record.[5] However, "[e]vidence presented outside the record must meet some threshold standard of cogency; otherwise it would be too easy to defeat the holding of Perry by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis and a desire for further discovery."[6] Equally important, as our court has emphasized, "the evidence dehors the record must not be evidence which was in existence and available for use at the time of trial and which could and should have been submitted at trial if the defendant wished to use it."[7]
 {¶ 46} Here, to support his claims for postconviction relief, Kenney attached affidavits by David Finley, his trial counsel Alan Rossman, and himself.
 {¶ 47} Finley's affidavit averred he was incarcerated in a juvenile detention facility in Cleveland between September 9, 2001, and December 12, 2001. He stated that, while there, he overheard a telephone conversation between a Ricardo Ruiz and an individual by the name of "Candace," in which Ruiz admitted to "Candace" that he had been involved in the robbery and homicide of Terrence Robinson. Finley stated he provided that information to Detective O'Malley and Alan Rossman, and was subsequently interviewed by both. He further stated following those interviews he encountered Ruiz in a juvenile detention facility and Ruiz admitted to him his involvement in the Robinson homicide. Finley did not specify when this encounter took place.
 {¶ 48} Alan Rossman's affidavit stated he interviewed Finly prior to trial, on October 31, 2001, regarding the alleged telephone conversation Finley overheard where Ruiz implicated himself in the Robinson homicide. He stated the state never disclosed this evidence to the defense, even though Finley had provided that information to the state's detective several weeks before his interview. Rossman also averred although the police had conducted a six-picture photographic array through which a newspaper delivery man, a Mr. Condrut, identified an individual other than Kenney, he only learned of this evidence at the commencement of trial. During trial, he also learned of another photographic array consisting of 15 photographs, from which a witness failed to identify Kenney. Furthermore, Rossman stated he learned from another witness's testimony that, in addition to the six-picture photographic array, that witness was shown a polaroid picture of Ruiz.
 {¶ 49} Kenney's own affidavit stated that while incarcerated he received a letter from Finley, an acquaintance, who indicated he had information regarding Ruiz' admission of his involvement in the Robinson homicide. Kenney stated he provided this information to Rossman in September 2001. He also averred that he "received additional information from Mr. Finley regarding Ricardo Ruiz after [his] trial," without specifying the nature of that information.
 {¶ 50} On the basis of these affidavits, Kenney claimed that he was entitled to postconviction relief because(1) the trial court erroneously denied his request for a continuance to investigate exculpatory evidence; (2) the prosecutor failed to disclose exculpatory evidence; and (3) he received ineffective assistance from his trial counsel.
 {¶ 51} Our review of the affidavits indicates that the evidence purportedly dehors the record, namely: the photographic arrays and information allegedly possessed by Finley about another person's involvement in the instant homicide, were all evidence in existence and available for use at the time of trial. Therefore, Kenney could have raised these claims on his direct appeal, yet failed to do so. Consequently, these claims are procedurally barred by the doctrine of res judicata.
 {¶ 52} We are aware an exception can be asserted in cases where a petitioner is claiming ineffective assistance of counsel in a postconviction relief proceeding. Under the exception, res judicata is not a bar to a petitioner's claim of ineffective assistance of counsel if he was represented by the same counsel at trial and on direct appeal.[8]
 {¶ 53} Here, all evidence Kenney presented as basis of his ineffective assistance of counsel claim was in existence at trial and therefore he could have raised this claim on his direct appeal but failed to. And, he cannot assert the same-counsel exception, because he was represented by different counsels at trial and on his direct appeal: John H. Carson, Jr., Esq., and Alan C. Rossman, Esq., represented him at trial and John B. Gibbons, Esq., represented him on his direct appeal.
 {¶ 54} Accordingly, res judicata bars his postconviction claim of ineffective assistance of counsel.[9]
 {¶ 55} Finally, when a trial court finds that an issue raised in a petition for postconviction relief should have been raised at trial or on a direct appeal, the court may dismiss the petition on the grounds of res judicata without first conducting a hearing.[10]
 {¶ 56} Consequently, we conclude the trial court properly dismissed Kenney's petition for postconviction relief and we therefore overrule his first, second, third, and fourth assigned errors.
 II. Criminal Appeal {¶ 57} In his fifth assignment of error, Kenney challenges the court's denial of his motion for a new trial.
 {¶ 58} We note Kenney filed this motion after he filed a notice of appeal from his convictions. When a case has been appealed, the trial court retains all jurisdiction not inconsistent with the reviewing court's jurisdiction to reverse, modify or affirm the judgment.[11] A motion for a new trial is inconsistent with a notice of appeal of the judgment sought to be retried.[12] Therefore, a defendant's filing of a notice of appeal divests the trial court of jurisdiction to consider a motion for a new trial.[13]
 {¶ 59} Where the trial court enters an order without jurisdiction, its order is void and a nullity.[14] No appeal can be taken from a void judgment, as a void judgment is necessarily not a final appealable order.[15] Therefore, Kenney's appeal from the court's denial of a new trial is dismissed.
Judgment affirmed in the civil appeal; criminal appeal dismissed.
ANNE L. KILBANE, J., and SEAN C. GALLAGHER, J., CONCUR.
[1] State v. Kenney, supra, at ¶ 2 to ¶ 32.
[2] (Emphasis original) State v. Reynolds (1997), 79 Ohio St.3d 158, quoting State v. Perry (1967), 10 Ohio St.2d 175, syllabus.
[3] Reynolds, citing State v. Duling (1970), 21 Ohio St.2d 13.
[4] See State v. Lawson (1995), 103 Ohio App.3d 307, citing Perry,10 Ohio St.2d at 182.
[5] See State v. Cowan, 151 Ohio App.3d 228, 2002-Ohio-7271
(citations omitted).
[6] Lawson, citing State v. Coleman (Mar. 17, 1993), Hamilton App. No. C-900811.
[7] State v. Slagle (Aug. 10, 2000), Cuyahoga App. No. 76834, citingLawson, 103 Ohio App.3d at 315; see, also, Cowan, supra.
[8] State v. Lentz (1994), 70 Ohio St.3d 527, 529-530; State v. Cole
(1982), 2 Ohio St.3d 112, 114; State v. Burns (Aug. 9, 2001), Cuyahoga App. No. 78488 (res judicata bars an ineffective assistance of counsel claim stemming from a petition for postconviction relief where the petitioner had retained new counsel on direct appeal)
[9] Accord, e.g., State v. Leek (July 12, 2001), Cuyahoga No. 78513;State v. Briscoe (Nov. 22, 2000), Cuyahoga No. 77832.
[10] See State v. Allen (June 4, 1998), Cuyahoga App. No. 72427, citingPerry and State v. Nicholson (July 24, 1997), Cuyahoga App. No. 71398.
[11] See The City of Richmond Heights v. Brown (June 29, 2000), Cuyahoga App. Nos. 76523 and 77040; Howard v. Catholic Social Serv. ofCuyahoga Cty., Inc. (1994), 70 Ohio St.3d 141, 146; Yee v. Erie Cty.Sheriff's Dept. (1990), 51 Ohio St.3d 43, 44; In re Kurtzhalz (1943),141 Ohio St. 432, paragraph two of the syllabus.
[12] See The City of Richmond Heights v. Brown; State v. Smith
(Nov. 6, 1997), Cuyahoga App. Nos. 69799, 70451, 71643, citingMajnaric v. Majnaric (1975), 46 Ohio App.2d 157, paragraph one of the syllabus.
[13] See Brown, supra. We recognize a trial court's jurisdiction to consider a motion for a new trial may nonetheless be conferred following a defendant's filing of a direct appeal through an order by the reviewing court to stay the appeal and remand the matter to the trial court for consideration of that motion. Brown, citing Howard v. Catholic SocialServ. Of Cuyahoga Cty., Inc., 70 Ohio St.3d at 147; State v. Hurd, Trumbull App. No. 2001-T-0086, 2002-Ohio-7163. Kenney, however, failed to apply to us for this order.
[14] State v. Taogaga, Cuyahoga App. No. 79845, 2002-Ohio-5062,
citing Stewart v. Zone Cab of Cleveland, Cuyahoga App. No. 79317, 2002-Ohio-335.
[15] See Short v. Short, Fulton App. No. F-02-005, 2002-Ohio-2290; Reedv. Montgomery Cty. Bd. of Mental Retardation and Dev. Disabilities (Apr. 27, 1995), Franklin App. No. 94APE10-1490,